839 F.2d 872
 28 Wage & Hour Cas. (BN 697, 56 USLW 2483,
108 Lab.Cas. P 35,027
 William E. BROCK, Secretary of Labor, United States
Department of Labor, Plaintiff-Appellee,
v.
CASEY TRUCK SALES, INC., John C. Caselinuovo, Individually,
and Casey Truck Salvage World, Inc., Defendants-Appellants.
 No. 159, Docket 87-6052.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 1, 1987.
Decided Jan. 29, 1988.
 
 James N. Schmit, Buffalo, N.Y. (Melinda G. Disare, Iris B. Schifeling, Damon & Morey, Buffalo, N.Y., on the brief), for defendants-appellants.
 Anne Payne Fugget, U.S. Dept. of Labor, Wash., D.C. (George R. Salem, Solicitor of Labor, Monica Gallagher, Assoc. Solicitor, Patricia M. Rodenhausen, Assoc. Regional Solicitor, Linda Jan S. Pack, U.S. Dept. of Labor, Wash., D.C., on the brief), for plaintiff-appellee.
 Before VAN GRAAFEILAND, MESKILL, and NEWMAN, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This appeal from a judgment for violations of the Fair Labor Standards Act concerns primarily the determination of motivation for conduct alleged to be unlawful, a matter that has been troublesome in a variety of cases, especially those involving employee discharges. Defendants-appellants Casey Truck Sales, Inc., Casey Truck Salvage World, Inc., and John C. Caselinuovo appeal from a judgment of the District Court for the Western District of New York (John T. Elfvin, Judge), after a bench trial, ordering them to pay $164,811.72 in back wages and interest to five former employees and to offer one of those employees reinstatement upon a finding that the employees had been discharged in violation of section 15(a)(3) of the Fair Labor Standards Act (FLSA), 29 U.S.C. Sec. 215(a)(3) (1982). The District Court also permanently enjoined the defendants from discharging employees in retaliation for exercising their statutory rights under the FLSA. The judgment rested on the Court's findings that the employees were discharged several weeks after a Department of Labor investigation concluded that these and other employees of Casey Truck Sales, Inc. were owed back wages for overtime and that defendant Caselinuovo, the company's owner, discharged the employees upon their refusal to take a "loyalty oath" requiring them to repudiate their rights to these back wages. Defendants contend primarily that the trial judge applied the incorrect standard of proof in an FLSA retaliatory discharge case. Defendants also challenge on both legal and factual grounds the trial court's determination that their conduct violated section 15(a)(3). Finally, defendants argue that the restitutionary relief ordered in this case, including reimbursement for lost wages, reinstatement, and prejudgment interest, was improper in various respects. We reject these contentions and affirm.
 
 Background
 
 2
 Defendant Casey Truck Sales, Inc. ("Casey Sales") is a New York corporation previously engaged in the business of reconditioning, rebuilding, and selling used trucks and truck parts. Though never formally dissolved, Casey Sales ceased doing business in 1983, at which time defendant Casey Truck Salvage World, Inc. ("Casey Salvage") was formed to succeed Casey Sales.[1] Defendant John C. Caselinuovo is the president and sole officer and shareholder of both Casey Sales and Casey Salvage.
 
 
 3
 Prior to May 1981, Caselinuovo and his employees had an informal agreement allowing the employees to work unlimited overtime hours at straight-time pay. In April 1981, a compliance officer of the United States Department of Labor, Angelo Sorci, was prompted by a complaint to investigate Casey Sales' compliance with the overtime pay provision of the FLSA. See 29 U.S.C. Sec. 207 (1982). After reviewing Casey Sales' overtime pay records, Sorci went to its business premises and interviewed nine employees, including the five discharged employees, Lawrence H. Bala, Raymond Matthews, Daniel J. Frank, Carmen Nappo, and David Fears (who died prior to trial). On May 8, 1981, Sorci informed Caselinuovo of his conclusion that Casey Sales was in violation of the FLSA because its employees had not been properly paid for their overtime work. Sorci also alleged that the company's records had been falsified in an attempt to hide its wrongdoing. Caselinuovo first denied the allegations but soon admitted they were true and agreed to pay overtime wages in the cumulative amount of $23,925.19 to twenty-seven employees, eleven of whom were still employed by Casey Sales.
 
 
 4
 It is undisputed that Caselinuovo was deeply disturbed by the outcome of the Department of Labor's investigation because of the "gentleman's agreement" that had existed between him and his employees respecting overtime pay. Various policies affecting the working conditions at Casey Sales were soon changed; lunch break was shortened, coffee breaks eliminated, and the unlimited overtime rule was rescinded. Caselinuovo later testified that he had considered the Department of Labor's determination "morally wrong" and desired an opportunity to ventilate his frustration.
 
 
 5
 On or about June 9, 1981, Caselinuovo convened a meeting of the eleven current Casey Sales employees owed back overtime wages. Employees not owed back wages were not included. At the meeting, Caselinuovo stated that he felt hurt and "betrayed" by the outcome of the investigation and opined that "anyone that felt that they really deserved those monies to me would be a parasite." Some of those present testified at trial that Caselinuovo also stated that he would "appreciate" the return of the payments and that he could determine "who his friends were" and who were "the loyal ones" by who returned the payment. Caselinuovo disputes that he ever sought return of the money owed to his employees. Rather, he claims he only wanted to know that their "sentiments" were with him. By all accounts, Caselinuovo requested that each of the employees speak to him individually and inform him of their answer to this question, in his own words: "Did they feel that they deserved the monies that were going to be coming to them ...?"
 
 
 6
 On June 12, 1981, Lawrence Bala went to Caselinuovo and expressed his belief that he was entitled to the overtime repayment and his intention to keep it. Bala then left for a one-week vacation. He was fired upon his return on June 22, 1981. On June 12, 1981, Daniel Frank also went to Caselinuovo and stated his intention to keep the money because he was entitled to it. Frank was fired one week later on June 19, 1981. David Fears likewise informed Caselinuovo that he felt legally and morally entitled to the money and that he would keep it. He was fired on June 19, 1981. Caselinuovo twice approached Carmen Nappo about the overtime payments, and on both occasions Nappo avoided any direct response to the question of entitlement. He was also fired on June 19, 1981. Raymond Matthews met with Caselinuovo during the week following the group meeting and stated that he would return the money if he would otherwise lose his job. He refrained from stating that he felt no entitlement to the money. Matthews was fired on June 19, 1981. Of those employees due overtime payments who were retained by Caselinuovo, all but one told him that they did not feel entitled to keep the money owed to them.[2]
 
 
 7
 The defendants contended at trial that Caselinuovo fired the five employees for reasons not associated with the Department of Labor's overtime wage investigation and without regard to their answers to his own subsequent loyalty investigation. Caselinuovo charged that Bala, an employee for two years, was terminated primarily because of his antagonistic and condescending attitude toward both customers and co-workers. Similarly, Frank and Nappo, employees since late 1980, were allegedly fired due to "attitude" problems. Frank's performance and outlook reportedly deteriorated sharply following the imposition of the post-investigation changes in working conditions at Casey Sales, and Nappo had been abusive and uncooperative generally. Nappo and Bala were also suspected by Caselinuovo of stealing parts from the shop on occasions in early 1981. Matthews, an employee for a total of approximately six years, was allegedly discharged on account of job absenteeism, tardiness, and unsafe work habits. Fears, who had been steadily employed by Casey Sales since 1977, was discharged for various "irritating" work habits, primarily a slow performance rate.
 
 
 8
 The District Court found that the five employees were discharged because of their refusal to comply with Caselinuovo's expressed desire that they repudiate their claims to the overtime wages. Though the Court noted that each of the five employees could lawfully have been discharged for deficiencies unrelated to the Department of Labor's overtime investigation, the "inescapable conclusion is that the 'straw that broke the camel's back' was the proper insistence (or non-waiver) by these five employees on their right to such [overtime] wages." Memorandum and Order of August 22, 1986, at 9. The Court thus concluded that the discharges violated section 15(a)(3) of the FLSA, which prohibits employment discrimination against any employee "because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified ... in any such proceeding." 29 U.S.C. Sec. 215(a)(3) (1982).
 
 
 9
 Upon finding that a violation of section 15 had occurred, the trial judge awarded damages for back pay to the five employees totaling $107,208.75 and prejudgment interest of $57,602.97. The District Court also ordered that Matthews alone be reinstated.
 
 Discussion
 
 10
 1. Liability Under Section 15(a)(3). Our consideration of the appeal may usefully begin with clarification of the two different, though related, approaches to deciding cases in which the lawfulness of adverse action taken against a plaintiff turns on a defendant's motivation. In all such cases, the plaintiff contends that the adverse action, e.g., discharge from employment, was taken for an improper reason, e.g., because the plaintiff was a member of a minority group or had exercised free speech rights, or, as in this case, had asserted rights guaranteed by the FLSA. In many of these cases, the defendant contends that he acted solely because of a valid reason, e.g., the plaintiff's inferior job performance. The fact-finder must determine whether the proper reason alleged by the defendant or the improper reason alleged by the plaintiff was the true cause of the adverse action. If the fact-finder concludes that the improper reason motivated the adverse action, the defendant's alleged reason is said to be a pretext. The allocation of burdens of proof in this type of case follows the now familiar three-step structure set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a racial discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1982). See, e.g., Davis v. State University of New York, 802 F.2d 638, 641 (2d Cir.1986) (applying McDonnell Douglas in racial discrimination case under Title VII); Meiri v. Dacon, 759 F.2d 989, 994 (2d Cir.) (applying McDonnell Douglas in religious discrimination case under Title VII), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); Geller v. Markham, 635 F.2d 1027, 1034 (2d Cir.1980) (applying McDonnell Douglas in age discrimination case under Age Discrimination in Employment Act, 29 U.S.C. Sec. 621 et seq.), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). The plaintiff has the initial burden to present a prima facie case of discrimination. Then, the defendant has a burden of production "to articulate some legitimate, nondiscriminatory reason" for the adverse action. McDonnell Douglas Corp. v. Green, supra, 411 U.S. at 802, 93 S.Ct. at 1824. Finally, the plaintiff has the burden of persuasion to prove by a preponderance of the evidence that the improper reason was the true reason. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981).
 
 
 11
 In many cases, however, the basis for the adverse action is not either the improper or the proper reason, but both reasons. That was the situation considered by the Supreme Court in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). A teacher contended he had been discharged because he had exercised his free speech rights. The school board contended that the discharge was based on inadequate job performance. The Supreme Court, recognizing the possibility that both reasons might have motivated the board, ruled that the board was entitled to prevail if the fact-finder concluded that the teacher would have been discharged even if the protected conduct had not occurred, i.e., that the improper reason was not the "but for" cause of the discharge. In resolving the hypothetical inquiry as to what the defendant would have done if only the valid reason had existed, the Court assigned the burden of persuasion to the defendant.[3] Subsequently, the National Labor Relations Board adopted this approach to dual motivation cases brought under section 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1), (3) (1982). See Wright Line, A Division of Wright Line, Inc., 251 N.L.R.B. 1083 (1980), enf'd, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). The Supreme Court approved the NLRB's Wright Line analysis in NLRB v. Transportation Management Corp., 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), noting that the opportunity to prove what would have happened if the valid reason alone had existed is an affirmative defense as to which the defendant properly bore the burden of persuasion.
 
 
 12
 As the pending case illustrates, many disputes are not framed as falling neatly into either the category of "pretext" cases governed by McDonnell Douglas or the category of "dual motive" cases governed by Mt. Healthy. The reason for the difficulty in differentiation is that the defendant usually presents evidence of a proper reason for adverse action without taking a position whether the proper reason is advanced (a) in lieu of the improper reason alleged by the plaintiff or (b) in addition to that improper reason.[4] Since defendants are not usually clear whether they are advancing a proper reason as the sole or only an additional reason for the adverse action, it is not surprising that fact-finders are not always clear as to which analysis they are using. If the fact-finder perceives the issue to be whether the improper reason alleged by the plaintiff or the proper reason alleged by the defendant was the true reason for the adverse action, the fact-finder will usually apply McDonnell Douglas. See Davis v. State University of New York, supra, 802 F.2d at 642 ("[T]he trier of fact must ultimately decide which party's explanation of the [defendant's] motivation it believes.") (citation omitted) (emphasis added). On the other hand, if the fact-finder perceives the issue to be whether the improper reason was the "but for" cause of adverse action motivated in part by two reasons, one of which is proper, Mt. Healthy will be applied.
 
 
 13
 In reality, these alternative ways of resolving motivation cases are not as distinct as might first appear.[5] To proceed correctly, the fact-finder who concludes a case by applying Mt. Healthy will have already found, either explicitly or implicitly, that the plaintiff has sustained his burden of proving the existence of an improper reason for the adverse action. In such circumstances, the case is really an application of both McDonnell Douglas and Mt. Healthy. See Ruggles v. California Polytechnic State University, 797 F.2d 782, 786 (9th Cir.1986); Blalock v. Metals Trades, Inc., 775 F.2d 703, 709-11 & n. 11 (6th Cir.1985); Perryman v. Johnson Products Co., 698 F.2d 1138, 1142 (11th Cir.1983); cf. Bibbs v. Block, 778 F.2d 1318, 1323-24 (8th Cir.1985) (in banc) (applying Mt. Healthy in a Title VII case only to limit relief, rather than to avoid liability). When plaintiffs win, the only difference between a dual motive case and a simple McDonnell Douglas case is that in the former case the fact-finder has concluded that the improper reason has been proved to exist, perhaps not to the exclusion of the defendant's proper reason but to a degree sufficient to warrant a finding that the improper reason was a substantial cause of the adverse action. See Davis v. State University of New York, supra, 802 F.2d at 642 (asking whether the improper reason "play[ed] a part" in the adverse action) (quoting Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir.1980)); id. at 644 (Newman, J., concurring).[6]
 
 
 14
 In the pending case, the defendants advance three challenges to the District Court's conclusion that the discharges were unlawful. They contend (1) that the District Court erred in applying the dual-motive analysis, (2) that the District Court failed to make a finding, as required by McDonnell Douglas, that the plaintiff has proved the employer's adverse action was motivated by an improper reason and (3) that such a finding of liability under section 15(a)(3) was in any event both legally and factually unsupportable. We disagree with all three contentions.
 
 
 15
 As our discussion of the "pretext"/"dual motive" cases indicates, it is entirely appropriate for a fact-finder to apply the analysis of Mt. Healthy (or Wright Line ) whenever the fact-finder determines that both an improper and a proper reason motivated adverse action. Doing so is not unfair to a defendant; on the contrary, it accords the defendant the benefit of an affirmative defense. Notwithstanding the improper reason, the defendant can prevail by proving that the adverse action would have been taken if the proper reason alone had existed. Judge Elfvin explicitly recognized that the defendants' opportunity to avoid a finding of violation by application of dual motive analysis was "an affirmative defense." Memorandum and Order of August 22, 1986, at 8. By according defendants this opportunity, the District Judge did not eliminate or lessen the burden on the plaintiff, in this case the Secretary, to prove that an improper reason motivated the adverse action.
 
 
 16
 Defendants' second point, that the trial judge failed conclusively to find proof of an improper reason, relies on the judge's statement that the Government had established "a prima facie case." Id. It is evident from the entirety of Judge Elfvin's opinion that he was not using the term in its precise sense of a quantum of evidence sufficient as a matter of law to permit a fact-finder to find in favor of the party bearing the burden of persuasion. Since Judge Elfvin was deciding the case without a jury, no special significance should attach to his use of a term more appropriate to cases where a judge must determine whether the evidence is sufficient to warrant a jury's consideration. The District Judge made it clear that he found the Secretary's evidence not merely sufficient to establish a prima facie case but sufficient to satisfy the plaintiff's ultimate burden of proving an improper reason by a preponderance of the evidence. "The inescapable conclusion," he wrote, "is that the 'straw that broke the camel's back' was the proper insistence (or non-waiver) by these five employees on their right to such [overtime] wages." Id. at 9. Moreover, his discussion of the applicable burden of proof relies heavily on NLRB v. Transportation Management Corp., supra, in which the Supreme Court, in applying dual motive analysis to a discharge challenged under the National Labor Relations Act, acknowledged that the General Counsel of the NLRB "carries the burden of proving the elements of an unfair labor practice." 462 U.S. at 401, 103 S.Ct. at 2474.
 
 
 17
 Finally, defendants' challenges with respect to the finding of section 15(a)(3) liability also fail. The contention that the five discharged employees were not engaged in protected activities under section 15(a)(3) is incorrect. After administering a "loyalty oath," Caselinuovo terminated the five employees because they insisted upon or refused to repudiate rights guaranteed to them under the FLSA. Section 15(a)(3) by its terms protects only against retaliation for initiating or testifying in proceedings. But the provision plays an important role in the FLSA by "foster[ing] a climate in which compliance with [its] substantive provisions ... would be enhanced," Mitchell v. DeMario Jewelry, Inc., 361 U.S. 288, 292, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960). Courts have therefore not hesitated to apply the protection of section 15(a)(3) to activities less directly connected to formal proceedings where retaliatory conduct has a similar chilling effect on employees' assertion of rights. See Marshall v. Parking Company of America-Denver, Inc., 670 F.2d 141 (10th Cir.1982) (per curiam); Brennan v. Maxey's Yamaha, Inc., 513 F.2d 179, 180-83 (8th Cir.1975); cf. Brock v. Richardson, 812 F.2d 121, 124 (3d Cir.1987) (finding section 15(a)(3) liability even where retaliation based upon employer's mistaken belief that employee engaged in protected activities). Protection against discrimination for instituting FLSA proceedings would be worthless if an employee could be fired for declining to give up the benefits he is due under the Act. On this basis, we are satisfied that Caselinuovo's reprisals were unlawful under section 15(a)(3). Also unavailing is appellants' contention that the liability determination is unsupported by the evidence. There is substantial evidence in the record to support the trial court's conclusion, and we will not disturb his findings on appeal, particularly where issues of credibility are concerned. See Fed.R.Civ.P. 52(a); Pullman-Standard v. Swint, 456 U.S. 273, 287-92, 102 S.Ct. 1781, 1789-92, 72 L.Ed.2d 66 (1982).
 
 
 18
 2. Relief. Section 17 of the FLSA, 29 U.S.C. Sec. 217, grants district courts broad equitable powers to restrain violations of section 15. See Mitchell v. DeMario Jewelry, Inc., supra. As this Court stated in Donovan v. Sovereign Security, Ltd., 726 F.2d 55, 58 (2d Cir.1984), "The purposes of a restitutionary injunction under section 17 are to make whole employees who have unlawfully been deprived of wages and to eliminate the competitive advantage enjoyed by employers who have illegally underpaid their workers." In addition to enjoining future violations of the Act, relief will ordinarily include a damage award consisting of reimbursement for loss of wages, e.g., Mitchell v. DeMario Jewelry, Inc., supra, 361 U.S. at 296, 80 S.Ct. at 337, and prejudgment interest, e.g., Brock v. Richardson, supra, 812 F.2d at 126-27; Donovan v. Sovereign Security, Ltd., supra, 726 F.2d at 58, as well as reinstatement of the discharged employee under appropriate circumstances, Goldberg v. Bama Manufacturing Corp., 302 F.2d 152, 156 (5th Cir.1962). In the present case, the trial court awarded lost wages to all five employees, plus prejudgment interest, and ordered that Matthews be reinstated.
 
 
 19
 Recognizing that reimbursement for lost wages is an essential part of the restitutionary remedy under section 17, the District Court awarded each of the five employees back pay from the time of their discharge until the time of trial. Bala was awarded $23,349.49, Fears $19,336.72, Frank $6,107.00, Matthews $45,042.51, and Nappo $13,373.03. These amounts were carefully arrived at by determining first each discharged employee's hourly wage rate and the duration of his loss period. Upon a finding that reasonable efforts to mitigate damages had been made in each case, see Equal Employment Opportunity Comm'n v. Sandia Corp., 639 F.2d 600, 627 (10th Cir.1980), the District Court then properly offset the gross figures by each employee's interim earnings to arrive at the amounts listed above. The Court agreed with defendants' contention that unemployment benefits should be deducted from the gross amounts. See Equal Employment Opportunity Comm'n v. Enterprise Ass'n Steamfitters Local 638, 542 F.2d 579, 592 (2d Cir.1976), cert. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977).
 
 
 20
 Appellants' sole contention with respect to the lost wage calculation is that it was error to award lost wages for the "inequitably long time" between the date of discharge and the entry of judgment and that a six-month cutoff would have been appropriate in light of the employees' poor work records. See Hayes v. McIntosh, 604 F.Supp. 10, 21 (N.D.Ind.1984). We reject this contention and hold that the trial judge did not exceed his broad equitable powers by awarding lost wages until the time of judgment. We note that the District Court required proof of attempts at mitigation by the five employees and in fact determined that Nappo should not be awarded damages after March 12, 1983, due to his failure to make efforts at finding employment after that date. Though Caselinuovo might in any event have fired the five employees within six months after the date of their discharge had retaliation not been part of his motivation, the trial judge was entitled to think otherwise.
 
 
 21
 We also affirm the prejudgment interest award totaling $57,602.97. We have previously held that prejudgment interest is normally an appropriate component of a restitutionary back pay award under section 17 of the FLSA. Donovan v. Sovereign Security, Ltd., supra. In Sovereign Security, Chief Judge Feinberg stated two primary reasons underlying that holding. First, prejudgment interest "obviously serves the compensatory purpose by making up for the delay in receiving the money, during which time the employees were denied its use, and by partially offsetting the reduction in the value of the delayed wages caused by inflation." 726 F.2d at 58 (citation omitted). Second, an award of prejudgment interest "also serves to remedy the competitive disadvantage inflicted on law-abiding businesses by denying the errant employer the free use of the money it should have paid out in wages." Id.
 
 
 22
 Appellants seek to limit Sovereign Security to the context of unpaid overtime cases under section 7 of the FLSA. They argue that the rationale underlying Sovereign Security does not apply in a section 15(a)(3) discharge case because the employer reaps no economic benefit from his wrongful act. This argument not only ignores the compensatory half of the Sovereign Security discussion but fails even as to the rationale it purports to distinguish. See Brock v. Richardson, supra, 812 F.2d at 127; Ford v. Alfaro, 785 F.2d 835, 842 (9th Cir.1986). Though the employer in a retaliatory discharge context has incurred the expense of paying new employees the wages he would have paid the discharged employees, the employer has nonetheless retained during the interim between discharge and judgment the benefit of not having to pay funds that are rightfully due his former employees.
 
 
 23
 Furthermore, though the discharge context differs from the underpayment context in that no competitive advantage over law-abiding businesses is gained directly through the retention of freed-up funds, we should not assume that the employer gained nothing but emotional satisfaction from the discharges. Presumably he also gained the advantage of the fearful silence of the remaining employees. This silence, until broken by a judgment against the employer, provides the employer an opportunity for continued wrongdoing and strikes at the core of the complaint-based enforcement mechanism contemplated by the FLSA. See Mitchell v. DeMario Jewelry, Inc., supra, 361 U.S. at 292, 80 S.Ct. at 335. We believe a prejudgment interest award removes whatever incentive an employer might have to derive a benefit from retaliatory discharges or from delaying the conclusion of remedial litigation. For these reasons, as well as the compensatory purposes served by the award of prejudgment interest, we affirm the award.
 
 
 24
 Finally, appellants contend the District Court erred by ordering the reinstatement of Raymond Matthews. Again, ordinarily the full measure of relief, including reinstatement, is the appropriate remedy under section 17 unless the trial court in its discretion finds "compelling reasons ... to order something less." Goldberg v. Bama Manufacturing Corp., supra, 302 F.2d at 156. Those reasons may include continued bitterness or hostility between the employer and employee, at least where the work place is a small one, see Hayes v. McIntosh, supra, 604 F.Supp. at 20, or a plainly unsatisfactory work performance by the employee prior to discharge, see Goldberg v. Bama Manufacturing Corp., supra, 302 F.2d at 156. It cannot be said on the record presented that the District Judge's order to reinstate Matthews failed to take these considerations into account, and we will not second-guess his exercise of discretion.
 
 
 25
 Affirmed.
 
 
 
 [1]
 We reject at the outset the contention of defendant Casey Salvage that it is not properly listed as a party bound by the judgment. The complaint named Casey Sales and John C. Caselinuovo as the defendants and was served upon both of them. The District Court granted leave to file an amended complaint naming Casey Salvage as a defendant, although no such complaint was ever served. Casey Salvage was incorporated approximately one year after the Secretary commenced the present action. At that time Caselinuovo, the president and sole officer and shareholder of both Casey Sales and Casey Salvage, transferred the assets, equipment, and employees of Casey Sales to Casey Salvage, and the new company thereupon became engaged in essentially the same business as the abandoned company. The interests of Casey Salvage are substantially identical to those of Casey Sales and Caselinuovo and were fully represented in fact throughout this litigation. The same attorney represents both corporate entities and their sole officer and shareholder. Under these circumstances Casey Salvage is bound by the judgment. Cf. Fed.R.Civ.P. 65(d) (included within scope of injunction are non-parties "in active concert or participation" with the parties); Golden State Bottling Co. v. NLRB, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973) (purchaser bound by injunction issued against acquired company); 11 C. Wright & A. Miller, Federal Practice & Procedure Sec. 2956 (1973) (construing the privity concept in Rule 65(d) to apply to non-parties "so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding," id. at 560 (footnote omitted))
 
 
 [2]
 William Rafter, Sr. evidently told Caselinuovo that he was going to keep the money. Caselinuovo responded, "I figured as much," but did not fire him
 
 
 [3]
 In Title VII cases, the Court appears to have placed the burden of persuasion as to "but for" causation upon the plaintiff, see McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976), though it has subsequently applied Mt. Healthy and placed the burden of persuasion on the defendant in a Title VII case, East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 404 n. 9, 97 S.Ct. 1891, 1897 n. 9, 52 L.Ed.2d 453 (1977) (alternate holding), and in a case of racial discrimination arising under the Fourteenth Amendment, Hunter v. Underwood, 471 U.S. 222, 228, 105 S.Ct. 1916, 1921, 85 L.Ed.2d 222 (1985)
 
 
 [4]
 The defendant also has a third option: He can plead in the alternative (a) that his proper reason for the adverse action was the only reason or (b) as a fallback position if the plaintiff persuades the fact-finder that the improper reason existed, that the defendant would have taken the adverse action in the absence of the improper reason
 
 
 [5]
 It has been observed that every adverse action case can be analyzed either by starting with the "pretext" analysis and then, if the facts warrant, going on to the "dual motive" analysis, or by starting with the "dual motive" analysis and, if the facts warrant, going on to the "pretext" analysis. See NLRB v. Charles Batchelder Co., 646 F.2d 33, 43 (2d Cir.1981) (Newman, J., concurring)
 
 
 [6]
 It is possible for the fact-finder to apply Mt. Healthy and find in favor of the defendant without making an explicit or implicit finding under McDonnell Douglas that the improper reason exists. The fact-finder may assume, for purposes of the case, that the improper reason exists and then conclude that the defendant has proved that he would have taken the adverse action even in the absence of the improper reason. See NLRB v. Charles Batchelder Co., supra, 646 F.2d at 43